PER CURIAM:
Claimants brought this action for damage to their well which they allege was caused by respondent’s negligent drilling of core borings during a construction project on Route 2 near Colliers in Brooke County. The Court is of the opinion to deny this claim for the reasons set forth more fully below.
The incident giving rise to this claim allegedly occurred sometime in mid-January 1999. A core boring project being performed by HDR, an engineering firm with which respondent had a contract, began in late December or early January of 1998. The core borings were necessary for respondent to design a “cut slope” along Route 2 in Brooke County as part of a road widening project to widen Route 2 from a two-lane highway to a four-lane highway. Claimants’ home is located on a hillside above the Ohio River in Brooke County on a 250 acre farm. Claimants have a 3,000 foot property line that is adjacent to the east boundary of State Route 2. Claimant David A. Velegol had the well at issue drilled in 1971 at about the same time he had the house built in which claimants currently reside. The well had a sixteen gallon per minute one and one-half horsepower pump installed at the time it was drilled and it *129 was the same pump still in use until the incident at issue. The well was 177 feet deep. At the bottom of the well, there was a storage capacity of twenty feet. The pump was located approximately six feet off the bottom of the well so it could avoid any sediment that may fall there. An aunt and uncle live within one hundred feet of claimants’ home and they are also provided water by this well. According to Mr. Velegol’s testimony, the quantity of the well water prior to this incident was very stable. However, on January 23, 1999, claimants first noticed that they had lost their water. Mr. Velegol testified that he turned on the spigot and had absolutely no running water. He had not noticed any problems with the water flow prior to January 23, 1999. According to Mr. Velegol, the water flow on January 22, 1999 , was perfect. He stated that he went through a routine series of diagnostic tests to determine the problem. He ruled out a blown fuse, pump failure, electrical relay problems, or a break in the lines. Fie had just put in new heavy duty plastic pipe and he was certain that it was not a break in the line.
Thereafter, claimants attempted to reestablish water from the existing well by extending it deeper. Claimants hired an individual to drill to a deeper level in an attempt to establish water. However, claimants were unable to reestablish water and after one week of drilling they decided it was impractical to continue this effort and chose a different location to drill a new well. Claimants had a new well drilled in late February or early March 1999. During the time that claimants did not have the use of their well, they purchased a 1800-gallon water tank to transfer the water into their system for use by themselves and their aunt and uncle until water from the new well was available.
It is claimants’ contention that respondent negligently conducted the drilling of core borings during its widening project of Route 2 near their home. Claimants contend that the core boring project was the proximate cause of the loss of the water flow from their well. As a result of respondent’s alleged negligence, claimants seek an award in the amount of $11,030.01, plus interest, which represents the cost of providing water while the new well was being dug, the cost of the new well, the cost of attempting to rehabilitate the old well, and landscaping for their yard .
Claimant David Velegol testified that he is a licensed professional engineer and that he has worked in the field of engineering for 38 years. Mr. Velegol has a masters degree in mechanical engineering and has specialized in the area of “fluid flow and heat transfer”. Mr. Velegol’s theory as to the cause of the loss of his well water is that during the drilling of the core borings, the drilling ruptured a major underground artery in the aquifer that was supplying water to his home.
Respondent’s position is that the project for drilling core borings did not cause or contribute to the damage to the claimants’ well in any manner.
Robert L. Dodson, III, was employed by HDR Engineering as the project geotechnical engineer for respondent’s core boring project which is at issue in this claim. Mr. Dodson testified that there were a total of twenty three core drillings performed. Borings one through twelve were performed on the south side of the valley. Borings thirteen through twenty-one were performed north of the valley. There were two supplemental holes drilled on each side of the valley in the same vicinity as the others. The closest core boring hole to claimants’ property was hole number sixteen which was 640 feet away from claimants’ well. Core boring hole number fifteen was 710 feet away from the well. The equipment used in drilling the borings consisted of “track and rubber tire mounted drill rigs” that were described as looking similar to all-terrain vehicles and approximately the size of a pick-up truck. Mr. Dodson testified that the drilling machine that punched holes into rock surface *130 was approximately three inches in diameter. The drilling machine used to punch holes into the soil was approximately six to eight inches in diameter.
According to Mr. Dodson, the core borings showed the makeup of the strata below the surface of the ground. The strata near the location of the claimants’ well consisted of approximately ten to twenty feet of soil, minor layers of bedded shale and sandstone, then a major unit of sandstone 90 to 110 feet thick. Finally, there is a sequence of shales and claystone. The major unit of sandstone which is 90 to 100 feet thick is referred to as the Morgantown Grafton sandstone. Mr. Dodson stated that sandstone is considered to be a good water-bearing formation, and it is from this unit that most of the wells in the area including the claimants get their water. Mr. Dodson also testified that the Morgantown Grafton sandstone is the aquifer for the entire area.
In response to the claimants’ initial complaint of the loss of water flow from the well, the respondent sent Mr. Dodson to investigate the claimants’ well and determine if the core borings were the proximate cause of the loss of water flow from claimants’ well. As a result of this investigation, the respondent reached a conclusion by approximately January 28, 1999 that “while possible, it’s not probable that any of the core borings affected the water level or quality in the Velegol well.” Mr. Dodson testified that since then he has obtained more information and it is now his professional opinion that it is “highly unlikely” that any of the core borings affected the water level or quality of the Velegol well. Mr. Dodson also testified that during his investigation he discovered that there are two homes with wells that are just a few hundred feet from the core borings and that none of the residents had any trouble with their wells.
Mr. Dodson conducted investigations in the late summer of 1999 and in November of 1999 regarding the causation of the loss of the claimants’ well water. This “well study” report was prepared by Mr. Dodson for the respondent in May of 2000. It compared and contrasted the water production of claimants’ “old” well that was allegedly damaged and the new well that they were forced to drill. The “old” well had a yield of 7.73 gallons of water per minute with a five gallon per minute pump while the yield from the new well was 11.5 gallons of water per minute The water quality test showed that the “old” well had 5x the level of iron in it as did claimants’ second well. Mr. Dodson stated that he attributed this to the rust on the casing of the old well, whereas the new well did not have the same problem. However, according to this test, the hardness of the water from the new well was much worse than the old well. The old well had 218 milligrams per liter of hardness while the new well had 429 milligrams per liter of hardness. Mr. Dodson concluded from this study that the old well had fully regenerated itself by November of 1999.
As the parties in this claim are aware, the Court referred this claim to a consultant, Dr. Mark A. Widdowson, Ph.D., P.E. Dr. Widdowson is an Associate Professor of Civil Engineering at Virginia Polytechnic Institute and State University. He specializes in the area of hydrology and he was the Program Coordinator for the Hydrosystems Graduate Program from 1999-2001. Dr. Widdowson was asked to render his expert opinion in the field of hydrology regarding the facts of this claim. After reviewing the pleadings, the exhibits, and the transcript in this claim, Dr. Widdowson rendered his expert opinion to the Court by teleconference and by a short written summary.
It is his opinion that neither party established a compelling technical explanation for the temporary failure of claimants’ well. He reviewed the rainfall records for the entire year of 1999 and determined that Januaryl999 was one of the *131 wettest years on record. There were drought conditions during the summer of 1999. However, the rainfall for November of 1999 was near or above average. Therefore, he concluded that it is highly unlikely that the drought contributed to the problem. Dr. Widdowson also stated that given the specifications and condition of the claimants’ well as determined by the respondent’s investigation conducted in November 1999, it is not probable that the respondent’s core borings caused the rate of water production from the well to substantially decline on and around January 23, 1999. Dr. Widdowson indicates that due to the respondent’s inadequate hydro geo logic investigation, the effect of the core borings on the flow of water from claimants’ well is uncertain, and the possibility of a negative effect should not be ruled out.
However, Dr. Widdowson also concludes that due to the lack of information about the condition of the water table on and around January 23, 1999, the date that claimants’ well stopped producing water, there is no way to determine the specific cause of the failure of claimants’ well.
In all claims it is the burden of the claimant to establish by a preponderance of the evidence that the respondent acted negligently and that the alleged negligence was the cause of the damage to property of the claimant. In the instant claim, the claimants bear the burden of proving that respondent was negligent in drilling the core borings, and, further, that such negligence was the proximate cause of the temporary loss of water flow from their well. Absent specific evidence that the proximate cause of the damage to claimants’ well was the core boring project, the Court is constrained to deny the claim. Stephenson v. Division of Highways 22 Ct. Cl. 98 (1998). If the claimant does not establish the proximate cause of the damages then the Court is left to speculate as to the cause. This Court has consistently held that an award cannot be based on speculation. Mooney v. Department of Highways 16 Ct. Cl. 84 (1986); Phares v. Division of Highways 21 Ct. Cl. 92 (1996).
After a thorough review of the evidence and the expert evidence in this claim, the Court is of the opinion that the claimants have not established that the temporary loss of water from their well was the result of any negligence on the part of the respondent. Although the timing of the loss of the water flow from the well is suspicious, the claimants did not establish by a preponderance of the evidence that any specific actions of the respondent caused this particular loss of water from their well. The evidence produced did not establish what caused the temporary loss of the water flow from the well.
Therefore, in accordance with the findings of fact and conclusions of law as stated herein above, the Court is of the opinion to and does deny this claim.
Claim disallowed.